## S89A0510. RIDLEY v. GRANDISON.
### (389 SE2d 746)

SMITH, Presiding Justice.

We granted the appellant's discretionary application, and we affirm. The appellant, Jerome Ridley, and the appellee, Mae Grandison, a/k/a Mae Ridley, met in Virginia in 1976. Sometime in 1979, the appellant moved into the appellee's apartment with the appellee and her son, and they resided there together for approximately six years.

In June 1985, the appellant moved to Macon and in December 1985, the appellant moved the appellee and her son to Macon. He claimed the moving expenses on his federal tax return; he claimed the appellee's son for federal and state income tax purposes; and filed taxes as head of household. Shortly after moving into their Macon home, the parties completed a credit application with a local furniture company. The application stated: "Whether or not married, you have the right to apply for credit separately from or jointly with your spouse or another person." The parties checked the box marked "married," and the appellee signed the application as "Mae Ridley." The parties obligated themselves for an amount in excess of five thousand dollars for the furniture they purchased with the approved credit application.

In 1988 the appellee filed a complaint for divorce; one of the grounds was adultery. In her complaint she alleged that she and the appellant had a common law marriage. The jury found that a common law marriage existed and awarded the parties a divorce. There was a division of property and liabilities on the property and the appellee was awarded alimony for three years.

After a hearing, the trial court found that there was sufficient evidence to support the jury's finding and verdict and the appellant's motions for j.n.o.v. and new trial were denied.

There was evidence to support the jury's verdict in this case, and this Court will not disturb a verdict if there is any evidence to support the verdict. *Horton v. Kitchens,* 259 Ga. 446 (383 SE2d 871) (1989).

*Judgment affirmed. All the Justices concur, except Weltner, Hunt, and Fletcher, JJ., who dissent.*

HUNT, Justice, dissenting.

In the absence of a positive legislative enactment declaring unlicensed, nonceremonial marriages to be void, common law marriages have been recognized in Georgia since at least 1860. Under OCGA § 19-3-1 the essential elements of a marriage, are (1) the parties must be able to contract, (2) there must be an actual contract, and (3) there must be consummation according to law. These three requirements must be met at one period in time in order to form a common law marriage. *Brown v. Brown*, 234 Ga. 300, 301 (215 SE2d 671) (1975).

> When the relationship between the parties begins as an illicit arrangement, the burden is on the party asserting the validity of the marriage to show that the illicit relationship ended and that the parties did actually enter a marriage contract. [Cit.] . . . "This may be done by . . . such circumstances as the act of living together as man and wife, holding themselves out to the world as such, and repute in the vicinity and among neighbors and visitors that they are such, and indeed all such facts as usually accompany the marriage relation and indicate the factum of marriage. The evidence in each case is for the jury." [Cit.]

Id. at 302.

1. The evidence in support of the existence of a marriage included (1) Grandison's testimony that "I consider myself as married to Mr. Jerome Ridley. . . . He helped me to see after my child and he did not leave"; and,

> Q: After you got to Georgia, did you and Jerome Ridley ever talk about getting married? A: No. I figured that we were already married. He brought me down here.

(2) A witness testified:

> I knew personally what their relationship was. I knew that they had not been legally married but nonetheless I considered them married. . . . To me they were a couple.

And (3) documentary evidence was presented, showing her signature as "Mae Ridley," on a credit card application, signed also by Ridley, that classified the parties as "married"; various bills and charge card tickets that identified Grandison as "Ms. Ridley," "Mae Ridley," or "Mrs. Ridley"; checks that Grandison wrote on Ridley's checking account signed by her in his name, and with his permission; and income tax returns on which Ridley claimed Grandison's child as his son, used a filing status as head of household, and claimed the expenses of

moving Grandison and her son from Virginia to Georgia.

2. Ridley offered as evidence the parties were *not* common law married that, in Virginia, each party filed separate income tax returns with Grandison filing as single and Ridley filing as head of household, while neither party ever filed a state or federal income tax return as married; the parties maintained separate checking accounts in Virginia, while in Georgia, Ridley had the only checking account; the parties maintained individual charge accounts in their own names; Grandison completed job applications in Georgia listing herself as single; Ridley listed himself as single on several work-related papers; and neither party ever introduced the other as a spouse.

3. The credit application mentioned above provides some evidence from which the jury could have found that Ridley and Grandison held themselves out as man and wife — if not "to all the world," at least to a financial source. That evidence, however, is atomized by the following colloquy during the cross-examination of Grandison:

Q: What name is on your driver's license?
A: Mae Katherine Grandison.
Q: And you list yourself as being single don't you?
A: Yes I do.
Q: Okay, and when you list yourself — So we don't get it confused — you understand that being single is not being married; is that your understanding?
A: No.
Q: In other words, if you're single, are you married? If you're married, are you single?
A: You're getting the issue — single for what purpose?
Q: I mean I think either you're single or married. I don't think there's any halfway into it or halfway out of it. Which way is it?
A: *I am single.* [Emphasis supplied.]
Q: Okay, you're single? You have listed your other places — Now, you've applied and you've worked at several places in Georgia and you've applied in several other places, have you not?
A: Yes, I have.
Q: Did you list yourself as single or as being married?
A: As single. . . .
Q: Do you ever recall a single incident when he introduced you and said to someone, "This is my wife?"
A: No, I would say, no.
Q: Thank you. You never introduced him to anyone as your husband either, did you?

A: No.

Grandison's statement, "I am single," defeats her claim. That is, where both parties, as here, deny in court the existence of a marriage contract, characteristics of marriage such as those referred to in Division 1, cannot, by themselves, establish the existence of a marriage contract. I would hold that the trial court should have granted Ridley's motion for judgment n.o.v. and, therefore, must dissent.

I am authorized to state that Justice Weltner and Justice Fletcher join in this dissent.

WELTNER, Justice, dissenting.

1. I join in Justice Hunt's dissent. Three of us concluded that the evidence demands a verdict for Ridley and entitles him to a judgment n.o.v. A majority of four has prevailed in holding that the jury's verdict must be upheld because there is *some* evidence to support it. The very nature of this dispute illustrates the reasons that I maintain that it is time for a re-examination of common law marriage.

2. There can be no criticism of the reasons for the recognition, at the outset, of common law marriage. It is both a heritage from our frontier days, as well as a means of avoiding the disadvantages of "illegitimacy" that burden the child whose parents have foregone a ceremonial marriage.[1] There is, however, substantial need for a new and critical inquiry as to whether prevailing principles of common law marriage serve the present age.

3. This very case presents a strong argument for such a re-assessment, bearing in mind its uncertainties and delays, and the enormity of resources devoted to it. The complaint for divorce was filed in June of 1988. The parties spent three days in trial, calling seven witnesses,

---

[1] For a discussion bearing the mark of nineteenth century mores and rhetoric, see *Dillon v. Dillon*, 60 Ga. 204 (1878):

For years and years, Mr. Dillon lived with Mrs. Dillon as his wife, recognizing and treating her as such. Of her, he begat children; and the parents and children were grouped as a family, and as such lived, openly, in the city of Savannah, the largest city of Georgia, and one of the most respectable cities of the world. If the marriage tie had been wanting, would this have occurred? Could it have occurred, in the midst of a moral and refined community, and under the eye of the police? The jury belonged to the vicinage, and could and did interpret the testimony in the light thrown upon it by the local *gloss*. They understood what such a mode of living in Savannah meant; whether it meant concubinage or matrimony. . . . Society, and each member of society — the mass and the individual — are benefited by closing the mouth of any man against repudiating his family when they come to him for needed support. If he may cast them off, they will, in many instances, fall a weighty burden on the public. To allow a husband to indulge in scruples about the pedigree of his old wife [he claimed she was of African descent and unable by law to marry him], when her youth, beauty and strength have all waned, and thus escape responding to her claim for reasonable alimony, would be unwise in policy, unsound in principle. [Id. at 206, 207.]

amassing a transcript of 439 pages, and entering into evidence seventeen exhibits — largely to determine whether or not they were married! And at the dawn of the new year, 1990, that issue remained yet unresolved.

4. The factual circumstances outlined in our recent case of *Vaughn v. Vaughn*, 255 Ga. 76 (337 SE2d 763) (1985), offer further support:

> The parties were divorced. They continued to live together, ostensibly as husband and wife. After a period of time, the former husband underwent a ceremony of marriage with another woman, and the two of them now have a small child.
>
> Soon after that ceremony, Vaughn's first wife filed an action against him, alleging that the parties had become married "by the common law," and were then husband and wife, notwithstanding the earlier divorce. She sought alimony and other relief. The question of the alleged marriage was tried by a jury, which found in favor of the first wife.
>
> That finding, of course, had the effect of voiding the ceremonial marriage which Vaughn had undertaken, and imposing upon the child born to the parties all of the disadvantages of what the law terms "illegitimacy." [Id. at 76-7, dissent.]

Thus, the very purpose of the initial recognition of common law marriage was defeated by the principles that we have developed to preserve it.

### Solution

5. Plainly, the law of common law marriage is chaos that cries out for order.[2] The materials found in the Appendix represent only eight years of turmoil, and only that disclosed at the appellate level. They reflect documentation of controversies that have been assembled subsequent to our case of *Johnson v. Green*, 251 Ga. 645 (309 SE2d 362) (1983). In that case, which arose from circumstances similar to this case, the present writer suggested:

> If it be the policy of the law to foster marriage as an institution essential to the stability and health of the Repub-

---

[2] An electronic survey reveals that since 1955, the appellate courts of this state have dealt with common law marriage in no less than 129 cases, in circumstances as varied as the lives of the people.

lic, we ill-serve that goal by discounting the existence of this most important of all human relationships to a swearing match — akin to the question of which driver had the green light; or, which of two brawlers struck the first blow; or, how long did the pain of whiplash endure.

Finally, if marriage is a state "not to be undertaken lightly" (as observed at almost every wedding) it should not be too burdensome to require of parties who intend to commit their very lives to each other that they make plain to all the world such an intent by undergoing a ceremony of marriage. [Id. concurrence at 647.]

6. In order to relieve the people and the courts of Georgia from much of the agony, whimsy and cost of disputed common law marriages, and to preserve those of its purposes that yet have merit, we could expand and extend the rule of *Brown v. Brown,* 234 Ga. 300, 301 (215 SE2d 671) (1975). Specifically, we could adopt a new evidentiary requirement, as follows:

*The evidence necessary to prove the conversion of an illicit arrangement into a common law marriage must include (in addition to existing evidentiary requirements) either (1) proof of a bona fide attempt to contract a valid ceremonial marriage; or (2) the birth to the parties (after the commencement of an illicit arrangement) of a child or children.*

7. The enlargement of the rule would preserve these virtues:

(a) no child of parents who have *not* contracted a valid ceremonial marriage would stand in any greater degree of being branded as "illegitimate" than was the case under formerly prevailing principles of common law marriage.[3]

(b) Similarly, no marriage could be attacked for a technical deficiency inhering in a *bona fide* attempt to enter into a contract of marriage.[4]

---

[3] See note in *Sapp v. Solomon,* 252 Ga. 532 (314 SE2d 878) (1984):
[T]here is nothing illegitimate about any child who is brought, involuntarily, into this world. The attaint of that term should be reserved, in proper cases, for parents.

[4] Indeed, the first decision on common law marriage in this state, *Askew v. Dupree,* 30 Ga. 173 (1860), was a response to a challenge to the validity of a marriage performed by a minister who had been stripped of his ministerial functions and powers by his church:
The conclusions to be deduced from the whole matter are these: That marriage is founded in the law of nature, and is anterior to all human law; that in society it is a civil contract; that if the contract is *per verba de presenti* — that is, I take you to be my wife, and I take you to be my husband — though it be not consummated by cohabitation, or if it be made *per verba de futuro,* and be consummated, it amounts to a valid marriage, in the absence of all municipal regulations to the contrary; and that notwithstanding there be statutes directing a license to issue, as in this State, and inflicting a penalty on any minister or magistrate who shall unite the parties in

12

(c) The "frontier tradition" would be maintained. That is, a man and woman who are *not* in an illicit arrangement still may contract per verba de praesenti to declare themselves husband and wife, which, followed by "consummation according to law" (OCGA § 19-3-1), will create a lawful marriage.[5]

8. The new rule would eliminate marriage by perjury and caprice. In doing so, it should lend order and stability to marriages undertaken with true intent and clear resolve.

APPENDIX.

Following our case of *Johnson v. Green*, 251 Ga. 645 (309 SE2d 362) (1983), our court has been presented with seemingly infinite variations upon the theme of common law marriage. We discuss these here in order to demonstrate the chaos and confusion that pertain, of necessity, when the legal status of marriage — wrapped as it is in emotion, and cloaked in a plethora of property rights — is beclouded by so unruly a doctrine as that of common law marriage.

Witness:

(1) A man was convicted of the murder of a woman who had lived with him. One of his contentions on appeal (although this issue was not reached) was that he and the woman were married by the common law and her adulterous conduct should serve as serious provocation. *Crosby v. State*, 259 Ga. 822 (389 SE2d 207) (1990).

(2) As part of a divorce action, a woman claimed a house and land bought before they were married to be marital property because she asserted that she and her husband were married by the common law four years prior to their ceremonial marriage. *Kuykendall v. Kuykendall*, Case No. S90A0266, disposed of by order, February 16, 1990.

(3) A man and woman married, were divorced, and later lived together for several months. A child was born, and subsequently the woman and child moved into the man's new home. The man claimed a common law marriage, filed for divorce, and sought custody of the child. *Blanton v. Blanton*, 259 Ga. 622 (385 SE2d 672) (1989).

(4) A man and woman married, produced a child, and separated. A second woman lived with the man and became pregnant. The man died in an airplane crash before completing divorce proceedings

---

wedlock, without such license, yet, in the absence of any positive enactment, declaring that all marriages not celebrated in the prescribed form, shall be void; a marriage deliberately and intentionally entered into by the parties, who are able to contract according to the rules of the common law, without conforming to the enactment, is still a valid marriage. [Id. at 189.]

[5] See *Lefkoff v. Sicro*, 189 Ga. 554 (4) (6 SE2d 687) (1939) (consummation according to law requires actual agreement in words of present tense to be man and wife with intention of assuming marital relationship).

against his wife. The wife applied to be administratrix of the intestate estate as surviving spouse. The second woman claimed to be the common law wife of the decedent and petitioned the court to remove the first woman as administratrix as next friend of the decedent's unborn child, who asserted a claim. *Simpson v. King*, 259 Ga. 420 (383 SE2d 120) (1989).

(5) The parties cohabited and produced a child. The court found that there was no common law marriage. During a temporary hearing, the father stipulated in open court that he was the father and agreed to pay $40 a week child support. The trial court entered a final judgment as to child support and visitation, which was reversed as premature and the case remanded. *Henderson v. Henderson*, 258 Ga. 205 (367 SE2d 40) (1988).

(6) A man and woman lived together for nine years, acquiring property together while she received a widow's pension from her previous marriage. The man left and married someone else. A jury awarded the woman an equitable division of the mutual property. *Henry v. Rice*, 258 Ga. XXX (1988).

(7) The parties married, were divorced, remarried others, were divorced from others, cohabited again, and separated again. A jury found a common law marriage and awarded the woman an automobile, $5000 lump sum alimony, and $800 per month periodic alimony. The judgment was affirmed on condition that a provision unauthorized by law (that the periodic alimony award survive the death of the husband and be payable from his estate) be stricken. *Foskey v. Foskey*, 257 Ga. 736 (363 SE2d 547) (1988).

(8) A woman was awarded temporary alimony based upon her assertion of a common law marriage. Ultimately the trial court denied her complaint for divorce, alimony, equitable division of property, and attorney fees upon proof of her incapacity to marry because of an undissolved ceremonial marriage to one man in 1964 and a subsequent undissolved common law marriage to a second man. *Smith v. Moore*, 257 Ga. XXVIII (1987).

(9) In a transaction for the sale of a house, a claim for fraud was based upon the agent's failure to disclose to the purchaser that the seller was the agent's common law spouse. *Smith v. Ross*, 255 Ga. 193 (336 SE2d 39) (1985).

(10) *Vaughn v. Vaughn*, supra, Division 4.

(11) A man died intestate leaving no spouse or children. The administratrix of an estate filed a petition to determine the heirs. An illegitimate child of a deceased brother of the deceased claimed a right to inherit even though his parents' common law marriage was void (because his father's previous marriage had not been dissolved). *Thompson v. Brown*, 254 Ga. 191 (326 SE2d 733) (1985).

(12) A retrial was necessary in a dispute concerning a widower's

right to a year's support because evidence of a common law marriage was excluded from the first trial. *Wigley v. Hambrick*, 193 Ga. App. 903 (389 SE2d 763) (1989); cert. denied.

(13) After a divorce, a mother was awarded custody of a child. The father sought a change in custody because of a material change in circumstances, claiming that the mother had been living with a man to whom she was not married. The mother's response was that the relationship is not meretricious because she had entered into a common law marriage. *Livesay v. Hilley*, 190 Ga. App. 655 (379 SE2d 557) (1989); cert. denied.

(14) A man convicted of theft by taking claimed that the victim was his common law wife. *Moore v. State*, Court of Appeals Case No. 77148, Jan. 24, 1989, unpublished; cert. denied.

(15) A man claimed heirship as the decedent's son by a common law marriage. *Edwards v. Edwards*, 188 Ga. App. 821 (374 SE2d 791) (1988).

(16) A man convicted of engaging in incest with his stepdaughter claimed that there was no proof that the victim was his stepdaughter, as no valid marriage existed between him and the mother of the victim. *Argo v. State*, 188 Ga. App. 102 (371 SE2d 922) (1988); cert. denied.

(17) A man convicted of burglary and other crimes asserted that one of the state's witnesses was his common law wife, and claimed a spousal privilege. *Brown v. State*, 187 Ga. App. 347 (370 SE2d 203) (1988).

(18) A legally separated wife contested a court's granting the petition of two children for letters of administration on the estate of her deceased husband. The children of the decedent claimed that their mother was married to him by the common law at the time of his death. *Wilson v. Willard*, 183 Ga. App. 204 (358 SE2d 859) (1987).

(19) A man convicted of burglary claimed that his codefendant was his common law wife, and thus was not compellable as a witness against him. *Lattimore v. State*, 175 Ga. App. 756 (334 SE2d 701) (1985).

(20) A man convicted of burglary claimed as one of his defenses a common law marriage to the victim, his former wife. He asserted that he could not be charged with committing theft if he took property belonging to a spouse. *Calloway v. State*, 176 Ga. App. 674, 677 (337 SE2d 397) (1985); cert. denied.

(21) A man convicted of rape claimed a presumption of consent based upon an assertion of common law marriage. *Brown v. State*, 174 Ga. App. 913 (331 SE2d 891) (1985); cert. denied.

(22) Two children claimed to be heirs to an estate, on the basis that their mother was the widow of the decedent by virtue of a common law marriage. Their claim was challenged by a son of the dece-

dent by a prior marriage. *Scott v. Jefferson*, 174 Ga. App. 651 (331 SE2d 1) (1985).

(23) Children challenged a petition for a year's support by the deceased's widow, claiming that she was not lawfully a widow because their father had not divorced his first wife when he entered into a ceremonial marriage with the woman claiming to be the widow, and that there was no evidence of a common law marriage. *Spann v. Clark*, 171 Ga. App. 690 (320 SE2d 822) (1984); cert. denied.

(24) A woman made a claim on an estate as the legal widow. A child of another marriage contested her claim, contending that the woman's purported marriage to the decedent was invalid because of his prior undissolved marriage to another (her mother). The woman responded that the marriage to the other claimant's mother was in fact void at the outset because of yet another prior marriage and another void divorce. *Baker v. Musa*, 170 Ga. App. 77 (316 SE2d 178) (1984).

(25) The parties married, were divorced, lived together once again, and separated. The wife sought an equitable distribution of "large amounts of wealth." The jury found no common law marriage. *Johnson v. Johnson*, Discretionary Application No. S90D0354, denied January 8, 1990.

(26) A woman claiming the existence of a common law marriage filed for divorce and was awarded $400 a month for two years, and title to a truck. The man challenged the sufficiency of the evidence, which included the testimony of a local attorney as an "expert in domestic law" on the question of whether a common law marriage existed. *Robertson v. Robertson*, Discretionary Application No. S89D0294, denied August 14, 1989.

(27) A man died, designating his niece as executrix. A woman challenged the will, claiming that she was the common law wife of the deceased. *McCune v. Edwards*, Discretionary Application No. S89D0276, denied August 11, 1989.

(28) A man died, leaving everything to a named executor. A caveat was filed by "children and alleged children" and another by an "alleged common law wife." *McMillan v. McMillan*, Interlocutory Application No. I0262, denied August 8, 1989.

(29) The trial court awarded temporary alimony to a woman who claimed a common law marriage. *Edelson v. Edelson*, Discretionary Application No. 4616, denied October 24, 1988.

(30) The parties lived together for four years before they were married. Upon divorce, the man was awarded real property, which the woman claimed as her separate estate on the theory that she owned it prior to the marriage. The man, in turn, claimed to be married by the common law at the time she bought the property. *Johnson v. Johnson*, Discretionary Application No. 4421, denied April 29, 1988.

(31) A will contest between two women, each claiming to be the surviving spouse, was transferred by this court to the Court of Appeals. *Clarke v. Clarke*, Discretionary Application No. 45354, transferred January 26, 1988.

(32) The parties were divorced, then cohabited, and separated again. The woman filed for a second divorce, claiming a common law marriage. A jury awarded her a divorce, equitable division of property, and alimony. *Salaun v. Salaun*, Discretionary Application No. 4066, denied June 19, 1987.

(33) The parties married, produced three children, were divorced, and then resumed cohabitation. The woman filed for a second divorce, claiming the existence of a common law marriage. The trial court directed a verdict in favor of the man, concluding that there had never been an agreement to marry, and refusing to allow her to testify that "in her heart and mind" she believed she was married. *Jones v. Jones*, Discretionary Application No. 4001, denied May 8, 1987.

DECIDED MARCH 9, 1990.

*E. Thomas Shaffer, Jr.*, for appellant.
*W. Louis Sands*, for appellee.